1

2

3                                                **E-FILED on**   __10/17/05__

4

5

6

7                     IN THE UNITED STATES DISTRICT COURT

8               FOR THE NORTHERN DISTRICT OF CALIFORNIA

9                          SAN JOSE DIVISION

10

| | |
|---|---|
| 11   ZORAN CORPORATION and OAK TECHNOLOGY, INC., | Case No. C-04-02619 RMW |
| 12             Plaintiffs, | |
| 13        v. | ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OF INVALIDITY DUE TO THE ON-SALE BAR |
| 14   MEDIATEK, INC., MINTEK DIGITAL, INC., ASUSTEK COMPUTER, INC., LITE-ON | **[Re: Docket No. 71]** |
| 15   INFORMATION TECHNOLOGY CORP., TEAC CORPORATION, TEAC AMERICA, | |
| 16   INC., TERAPIN TECHNOLOGY PTE., LTD. CORPORATION and TERAOPTIX L.P. d/b/a | |
| 17   TERAPIN TECHNOLOGY, | |
| 18            Defendants. | |

19

20        Defendants MediaTek et al. ("MediaTek") move for summary judgment of invalidity due to the

21 on-sale bar. Plaintiffs Zoran Corp. and Oak Technology ("Zoran" or "Oak") oppose the motion. The

22 motion was heard on December 10, 2004. While defendants' motion was still under submission, the parties

23 submitted numerous letter briefs. In July 2005, defendants requested leave to submit supplemental briefing

24 in support of their motion. Plaintiffs opposed the motion for leave and asked to file responsive briefing if

25 leave was granted. The court granted defendants' request for leave and allowed plaintiffs to respond. The

26 court has read and considered the moving and responding papers, the supplemental briefing, and heard the

27 arguments of counsel. For the reasons set forth below, defendants' motion for summary judgment is

28 DENIED.

# I.   BACKGROUND

Mediatek and Zoran are both involved in the manufacture and sale of optical drive controller chips used in CD-ROM[1] and DVD-ROM[2] drives.  Plaintiffs have asserted three patents related to optical drive controller chips in this action, two of which – U.S. Patent No. 6,584,527 ("the '527 patent") and U.S. Patent No. 6,546,440 ("the '440 patent") – are at issue in this motion for summary judgment.  The '527 and '440 are continuations of U.S. Patent No. 5,581,715 ("the '715 patent").

"The invention described and claimed in the '715 patent relates to an improved CD-ROM drive controller which provides faster and simplified data communication." *Oak Technology v. Int'l Trade Comm'n*, 248 F.3d 1316, 1318 (9th Cir. 2001).  The named inventors for the '715, '527, and '440 patents are Phil Verinsky and Michael Case.  Defendants allege, and plaintiffs do not dispute, that all three patents share a common element, "a host interface for an optical drive controller that allows the controller to communicate over the IDE/ATA bus."  Mot. Summ. J. at 3.  Communicating over the IDE/ATA bus, rather than the previously and widely used ISA bus, eliminates the requirement of an ISA host adapter card, thus lowering the cost of the drive.  *Id*. at 3.  In this motion, defendants argue that the '527 and '440 patents are invalid because the subject matter of these patents was on sale more than one year before the patent applications were filed.  *See* 35 U.S.C. § 102(b).  The '527 and '440 patents have the filing date of their parent, the '715 patent.  That date is June 22, 1994.

## A.      Development of Integrated Circuits Generally

The steps involved in developing an integrated circuit begin with defining its general architecture.  Initial schematics are prepared which depict circuitry for performing the functions set forth in the architecture, and once the initial schematics are created, their designs are verified.  As the design effort progresses, verifications are run and further analysis is done concerning the architecture and designs.  Once this iterative process reaches a point when all the simulation and verification that can practicably be employed are finished, the design is "taped-out."

The "tape-out" involves creation of a tape containing information that is used to manufacture "masks," which in turn are used by a semiconductor manufacturer to manufacture actual silicon chips.  *See*

---

[1]      Compact disc, read only memory.

[2]      Digital video disc, read only memory.

1   Verinsky Decl. ¶ 6.  The "tape-out" process usually begins when the designer of a new product believes

2   that the design is "done" or "substantially done."  *Id.* ¶ 7.  Designs may still change during the tape-out

3   process, but once it is determined that the tape-out accurately reflects the design of the chip, the tape-out is

4   used to manufacture a chip in silicon.  *See id.*  However, plaintiffs assert that when further simulation is

5   unable to substantially reduce uncertainties or for some other reason simulation is impracticable, a designer

6   may choose to manufacture silicon, even when there are doubts as to whether the design is correct, in order

7   to test the design in a real world environment.  *See* Verinsky Decl. ¶ 7.

8           **B.      Oak's Development of the OTI-011 Chip**[3]

9           Phil Verinsky was the project manager for the OTI-012, a predecessor to the OTI-011 that used a

10  proprietary bus.  The OTI-012 was taped-out in December 1991, and was being shipped in volume by

11  Oak by late 1992.  On November 2, 1992, Peter Brown of Oak prepared a document entitled "OTI-011

12  IDE CD-Rom Controller Engineering Specification," a high level block diagram of the OTI-011.  In

13  December 1992, Verinsky was selected by Oak president David Tsang as the project leader for the design

14  of the OTI-011.  *See* Chen Decl. Ex. 4; Brown 409-HT 202:9-18.  In January 1993 Verinsky asked Mike

15  Case to work on the IDE host interface of the OTI-011.  *See* Mot. Summ. J. at 4 (citing Verinsky 506 at

16  397:14-18, 402:1-403:17).

17          In April and May 1993, Oak offered to sell one million units of its OTI-011 chip to NEC.  The

18  agreement was memorialized in a signed memorandum dated May 27, 1993, which specified the price and

19  a minimum of 1 million units.  Peter Brown was confident that plaintiffs would be able to make the OTI-011

20  by the end of 1993 or beginning of 1994.  *See* Brown 409-HT at 275:21-276:5.

21          **1.      Defendants' Contentions Regarding Events Between April 1993 and June
                       22, 1993**

22

23          Defendants assert that by April 1993, Verinsky and Case "had conceived of the complete

24  architecture of their invention of a CD-ROM controller with an IDE/ATA interface."  *See* Mot. Summ. J. at

25  4 (citing Verinksy 409-HT at 1024:11-21; 1179:13-1180:15; Chen Decl. Ex. 6).  Verinsky testified that

26  by April 1993 plaintiffs had "decided to have direct interfacing to the IDE bus."  Verinsky 409-HT at

27  1024:14-15.  However, Verinsky went on to say that "I had formed in my mind a plan for this invention[,]"

28          _____

            [3]       Defendants refer to the "OTI-011," while plaintiffs refer to the "OTI-011A."  For purposes
       of this order, the court will refer to subject chip as the "OTI-011."

1    but "I didn't say I completed the architectural outline in April of '93[,]" and "I didn't know how the host

2    interface would be implemented."  Verinsky 409-HT at 1178:14-1179:12.  Defendants further assert that

3    by April 30, 1993 Case and Verinsky had produced a schematic that disclosed various limitations of claim

4    1 of the '440 patent.[4]  *See* Mot. Summ. J. at 5 (citing Chen Dec. Ex. 7).  By June 1993, defendants

5    contend that Case had a full set of initial schematics and was engaged in verification of the design.  *See*

6    Case 506 at 159:2-14, 498:12-23.[5]

7            Defendants contend that on June 10, 1993 Oak received a "Proposal for a Working Draft: ATAPI

8    CD-ROM Standard" from Western Digital ("WD").  Chen Decl. Ex. 9 ("June 1993 Proposed ATAPI

9    Specification").  A stamp appears on each page of the June 1993 Proposed ATAPI Specification stating,

10   "Draft For Oak Technologies Peter Brown."  The first page of the document provides this warning:  "This is

11   draft proposed American National Standard of Accredited Standards Committee X3.  As such this is not a

12   completed standard.  The X3T9 Technical Committee may modify this document as a result of comments

13   received during public review and its approval as a standard.  Use of the information contained herein is at

14   your own risk."  Chen Ex. 9 at 1039DOC000090.

15           The Overview on page 10 goes on to state:

16                   The primary objective of this Standard is to provide an inexpensive
                     CD-ROM interface.  The existing ATA does not provide an adequate
17                   Command Structure to support CD-ROM devices.  Although the inclusion
                     of a CD-ROM drive would compromise the performance of another disk on
18                   the same ATA Cable, this standard will not attempt to address the
                     "Performance" issues.
19

20   Chen Ex. 9 at 1039DOC000104, § 2.1

21           Defendants contend that between June 10, 1993 and June 22, 1993 Oak made the decision to

22   support WD's June 1993 Proposed ATAPI Specification because, as Oak employee Peter Brown

23   _____

24          [4]     Specifically, (a) the DRV bit of the drive/head register in the ATA command block
     registers; (b) the BSY bit of the status register in the command block registers; (c) circuitry to alter the BSY
25   bit in response to commands from the host; (d) circuitry to carry out initial signal transitions on DASP,
     PDIAG and HIRQ in response to soft reset and execute drive diagnostic commands; (e) circuitry to clear
26   the HIRQ signal when the host computer reads the status register; and (f) a path for the microcontroller to
     alter the BSY bit, read the DRV bit, and cause signal transactions on DASP, PDIAG and HIRQ.  Mot.
27   Summ. J. at 5.

28          [5]     Notably, Case states that by June 1993 he has a set of *initial* schematics.  *See, e.g.,* Case
     506 at 498:12-23

     ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OF INVALIDITY DUE TO THE ON-SALE BAR
     No. C-04-02619 RMW
     TNL/KMF/MAG                                                    4

1   purportedly stated, it was "complete enough to implement to."  Rutledge 409-HT at 1744:1-1745:5; Chen

2   Decl. Exs. 9, 13.[6]  Thus, defendants argue that the '715 patent was "ready for patenting" prior to June 22,

3   1993.

### 2.      Plaintiffs' Contentions Regarding Events Between April 1993 and June 22, 1993

5   According to plaintiffs, the OTI-011 was the first controller chip to provide for direct connection of

6   an optical disk drive to a host computer via an IDE/ATA bus.  *See* Verinsky Decl. ¶ 2.  At the time the

7   OTI-011 was designed, there was no pre-existing industry knowledge on how to design an optical disk

8   drive controller to operate in a real-world IDE/ATA bus environment.  *See* Verinsky Decl. ¶¶ 3-4;  Case

9   Decl. ¶ 2.  In addition, there were no simulation tools or programs that would permit Case and Verinsky to

10  confirm, without first reducing a design to an actual silicon chip, that their OTI-011 designs would work in a

11  real world IDE/ATA bus environment.  *See* Verinsky Decl. ¶¶ 12-13.  As the IDE/ATA bus was created

12  for hard disk drives, Verinsky and Case were concerned with how an optical disk drive would function

13  with an IDE/ATA bus, especially whether an optical disk drive and a hard disk drive could operate on the

14  same IDE/ATA bus, or whether the two devices would interfere with and prevent satisfactory

15  communications over the IDE/ATA bus.  *See* Verinsky Decl. ¶¶ 8-11; Verinsky 506 at 557:15-18;  Case

16  506 at 463:11-14.  Because the inventors were exploring new territory, it was not until after architecting the

17  design, and debugging and testing the silicon chip, that the inventors could determine whether the OTI-011

18  would be able to operate for its intended purpose.  *See* Verinsky Decl. ¶ 5;  Verinsky 506 at 557:15-18;

19  Case 506 at 463:11-14.  As of June 22, 1993 plaintiffs agree that the inventors had conceived of the idea,

20  but contend that because of the uncertain viability of the OTI-011 in a real world environment, it was not

21  yet "ready for patenting."

### 3.      Events Subsequent to June 22, 1993

23  The OTI-011 was first taped-out on July 22, 1993, but the tape-out was aborted.  A second

24  tape-out occurred on July 29, 1993 and was forwarded to a foundry for fabrication.  In order to

25  demonstrate that the design of the OTI-011 was operable, plaintiffs assert that the inventors needed to

---

[6]      Plaintiffs assert that this statement was attributed to Brown by a Western Digital employee, and that Brown made no such statement.  *See* Zolotorev Decl. Exs. 9-10 (Brown 409, Brown 506 deposition excerpts).

1    perform significant testing on the chip after receiving the first silicon.  The chip was received on August 22,

2    1993.  *See* Verinsky Decl. ¶¶ 20-21.  More than 30 design changes were made to the host interface of the

3    OTI-011 between June 22, 1993 and July 18, 1993.  *See* Verinsky Decl. ¶¶ 24-28, 38-49, Exs. 1, 6-8,

4    11;  Case Decl. ¶¶ 6-7.  Plaintiffs assert that these changes were material to the design of the OTI-011,

5    and necessary for the successful operation of the OTI-011 on the ATA/IDE bus.  *See* Verinsky Decl. ¶¶

6    29-30, 43-49, Exs. 1, 6, 7; Chen Exs. 7-9;  Case Decl. ¶¶ 7, 14.  Without implementing at least some of

7    these changes, plaintiffs assert that the chip would not have been operable.  *See* Verinsky Decl. ¶¶ 47-49;

8    Case Decl. ¶¶ 7, 14.  Testing continued through September 9, 2003, when it was confirmed that the chip

9    actually worked as intended.  *See* Verinsky Decl. ¶¶ 31-37, Exs. 2-5.

10          **C.      Related '715 ITC Proceedings**

11          As discussed in the court's earlier order on the parties' cross-motions to dismiss and for summary

12    judgment, Oak had previously filed a complaint against United Microelectronics Corporation ("UMC") in

13    the ITC alleging that UMC violated section 337 of the Tariff Act of 1930, 19 U.S.C. § 1337(a)(1)(B), by

14    importing articles into the United States which infringed the parent '715 patent.  UMC and Oak entered into

15    a settlement agreement on July 31, 1997 ("ITC-1"), and Oak subsequently filed a second action based on

16    similar allegations on April 7, 1998 ("ITC-2").[7]

17                **1.      ALJ Finding of On-Sale Bar Rendering the '715 Patent Invalid**

18          In ITC-2, after a January 1999 trial, the Administrative Law Judge ("ALJ") found, *inter alia*, that

19    the '715 patent was invalid due to the on-sale bar based on Oak's offer to sell NEC one million units of the

20    OTI-011.  *See* Chen Decl. Ex. 15.  After finding that the offer for sale was not in dispute, the ALJ found

21    that the OTI-011 was "ready for patenting" under *Pfaff v. Wells Elecs*., 525 U.S. 55, 67 (1998).  Six

22    different documents, either authored by Oak or in its possession, were "sufficiently specific to enable a

23    person skilled in the art to practice the claimed invention."  Chen Decl. Ex. 15 at 74-75.  The ALJ

24    acknowledged that Oak "continued to work on the OTI-011 after the critical date," but concluded that

25    "there [was] no evidence that anything Oak did after the critical date related to the patent disclosure, only to

26    circuitry or other features of the OTI-011 chip that are not disclosed by the ['715] patent."  Chen Decl. Ex.

27

28          [7]      The court's order on the parties' cross-motions for summary judgment contains a more
      detailed recitation of the facts surrounding the '715 ITC litigations and the consolidated actions in this court.

1   15 at 78.

2       **2.**   **Commission Reversal of ALJ's On-Sale Bar Findings**

3      In its October 1999 opinion, the U.S. International Trade Commission ("ITC" or "Commission")

4   reversed the ALJ's finding of an on-sale bar for the '715 patent:

5        We do not find that the collection of six documents satisfies the clear and
     convincing evidence standard for showing readiness to patent. The ID's

6        piecing together of the claimed invention from these documents is very
     different from the facts of either *Pfaff* or *Weatherchem Corp. v. J.L.*

7        *Clark Inc.*, 49 U.S.P.Q. 2d 1001 (Fed. Cir. 1998). At most, these
     documents evidence a conception of the invention, not a "readiness for

8        patenting" as contemplated in *Pfaff*. We do not read either *Pfaff* or
     *Weatherchem* to trigger the on-sale bar based on the point of conception

9        where one might have patented a device.

10  *See* Chen Decl. Ex. 14 at 51-55. The commission went on to note that such a use of the readiness for

11  patenting doctrine would have a widespread, negative effect on the electronics industry. "It is not unusual

12  for electronics manufacturers to seek customer commitments to purchase a semiconductor, even before it is

13  developed or the manufacturer is sure whether it can be developed. Electronics firms are not given to

14  spending research and development funds in the hope that someone may wish to buy the resulting

15  semiconductor product." *Id*. at 53 n.65. If courts and the Commission were to conduct hindsight

16  investigation of laboratory notebooks and specifications "from a piecemeal analysis, prospective inventors

17  would be forced to file applications any time they had a complete conception, and before they knew

18  whether the concept would work," thus frustrating the requirement that the specification provide an enabling

19  disclosure. *Id.*

20

21     **D.**   **Prosecution of the '527 and '440 Patents**

22     On March 6, 2000 during prosecution of the '440 and '527 patent applications,[8] plaintiffs submitted

23  an Information Disclosure Statement informing the Patent Examiner, *inter alia*, of the '715 proceedings, the

24  ALJ's finding of invalidity based on an on-sale bar, and the Commission's subsequent reversal of the ALJ's

25  finding. *See* Zolotorev Decl. Exs. 4, 5. It is uncontested that Chen Declaration exhibits 4, 9, 12, 14-18, 20

26  and 28, submitted in conjunction with this motion for summary judgment, were previously submitted to the

27  ───────────────

28     [8]   The '440 patent was filed as Application No. 09/442,866 ("'440 application"). The '527
patent was filed as Application No. 08/673,327 ("'527 application").

1    Patent Examiner.  The '440 and '527 patents issued on April 8, 2003 and April 24, 2003 respectively.

2        **E.    ALJ's On-Sale Bar and Infringement Determinations Based on the '527 and '440**
             **Patents**
3
             In ITC Investigation No. 337-TA-506 ("506 investigation"), an investigation of the '527 and '440
4
     patents before the ITC that is proceeding in parallel with this action, MediaTek filed a motion for summary
5
     judgment of invalidity due to the on-sale bar, apparently based on substantially the same evidence
6
     introduced in the instant motion.  On November 18, 2004 the ALJ denied MediaTek's motion.
7
             On May 16, 2005, the ALJ issued his initial determination that MediaTek and its customers only
8
     infringe claim 3 of the '527 patent.  In addition, the ALJ found that all patents asserted in the 506
9
     investigation are valid.  As a result of the ALJ's finding that MediaTek infringes claim 3 of the '527 patent,
10
     the Commission could potentially issue an exclusion order as early as September 2005.
11
         **F.    Supplemental Briefing Filed by Both Parties**
12
             After the defendants' present motion had been heard, defendants requested, and the court granted,
13
     leave to file supplemental briefing.  The court also permitted plaintiffs to submit responsive supplemental
14
     briefing.
15
             Defendants' supplemental brief focuses primarily on the argument that in light of the claim
16
     construction put forth by plaintiffs, claim 3 of the '527 patent is invalid due to the on-sale bar.  Defendants
17
     primarily focus on claim 3 of the '527 patent as it could trigger an exclusion order by the ITC as a result of
18
     the 506 investigation.  Addressing arguments set forth in various letter briefing, defendants also argue that
19
     enablement under the "ready for patenting" standard is the same as enablement under 35 U.S.C. § 112.
20
             Plaintiffs assert that despite defendants' contentions that the draft ATAPI specification renders claim
21
     3 ready for patenting, it in fact does not disclose several key limitations.  Plaintiffs therefore contend claim 3
22
     of the '527 is not invalid under the on-sale bar since it was not ready for patenting.  In addition, plaintiffs
23
     clarify that their position is that the "ready for patenting" standard is measured at a different time than
24
     enablement under section 112, and that what is enabling to one of skill in the art at the critical date may be
25
     different from what is enabling to one of skill in the art as of the application's filing date.
26
                                          **II.  ANALYSIS**
27
             Summary judgment is proper when the pleadings, discovery, and affidavits show that there is "no
28
     genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

1    Fed. R. Civ. P. 56(c).  Material facts are those which may affect the outcome of the case.  *Anderson v.*

2    *Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there is

3    sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.  *Id.*

4         A patent is presumed to be valid.  *See* 35 U.S.C. § 282.  This presumption only can be overcome

5    by clear and convincing evidence to the contrary.  *See, e.g., WMS Gaming Inc. v. International Game*

6    *Tech.*, 184 F.3d 1339, 1355 (Fed. Cir. 1999).  Thus, in their motion for summary judgment, defendants

7    must overcome the presumption of patent validity with facts supporting a conclusion of invalidity by clear

8    and convincing evidence.  *Dana Corp v. Am. Axle & Mfg., Inc.*, 279 F.3d 1372, 1375 (Fed. Cir. 2002).

9    Here then, defendants bear the additional burden of proving by clear and convincing evidence the

10   underlying facts for application of on-sale bar.  *See Allen Eng'g Corp. v. Bartell Industries, Inc*., 299

11   F.3d 1336, 1352 (Fed. Cir. 2002);  *Honeywell Int'l Inc. v. Hamilton Sundstrand Corp*., 370 F.3d

12   1131, 1145 (Fed. Cir. 2004).

13        "Section 102(b) of the Patent Act of 1952 provides that no person is entitled to patent an 'invention'

14   that has been 'on sale' more than one year before filing a patent application."  *Pfaff*, 525 U.S. at 57 (1998)

15   (citing 35 U.S.C. § 102(b)).  As the filing date of the '715 parent patent to the '527 and '440 patents was

16   June 22, 1994, the critical date for purposes of section 102(b) is June 22, 1993.

17        "[T]he on-sale bar applies when two conditions are satisfied before the critical date."  *Pfaff,* 525

18   U.S. at 67.  "First, the product must be the subject of a commercial offer for sale."  *Id.*  "Second, the

19   invention must be ready for patenting."  *Id.*  The term "invention" refers to a concept that is complete, rather

20   than "substantially complete."  *Id.* at 66.  "A determination that a product was placed on sale prior to the

21   critical date is a conclusion of law based on underlying findings of fact."  *Linear Technology Corp. v.*

22   *Micrel, Inc*., 275 F.3d 1040, 1047 (Fed. Cir. 2001); *Ferag AG v. Quipp, Inc*., 45 F.3d 1562, 1566

23   (Fed. Cir. 1995).[9]

24        **A.     Commercial Offer For Sale**

25        The first prong of *Pfaff* requires that the product be the "subject of a commercial offer for sale."

26

27        [9]     As a threshold matter, plaintiffs argue that the court must construe the claims at issue before
     considering defendants' motion for summary judgment of invalidity.  As this court entered Claim
28   Construction Order Regarding U.S. Patent Nos. 6,584,527 and 6,546,440 on September 9, 2005
     construing claims the parties agreed were dispositive, plaintiffs' objection on these grounds is moot.

1    *Pfaff,* 525 U.S. at 67.  Oak offered to sell the OTI-011 to NEC during an April 27, 1993 meeting.  On

2    May 27, 1993, prior to the critical date, Oak and NEC signed a memorandum specifying price and a

3    minimum of 1 million units.  As it is undisputed that the invention was subject to a commercial offer for sale

4    prior to the critical date, the court finds the first prong under *Pfaff*  satisfied.

5          **B.      Invention Ready for Patenting**

6          The second prong of *Pfaff* requires that the invention be ready for patenting.  *Id.*  That condition

7    may be satisfied at least two ways; (1) "by proof of reduction to practice before the critical date"; or (2) "by

8    proof that prior to the critical date the inventor had prepared drawings or other descriptions of the invention

9    that were sufficiently specific to enable a person skilled in the art to practice the invention."  *Id.*  The court in

10   *Pfaff* noted that it must be "clear that no aspect of the invention was developed after the critical date."  *Id.*

11   at 68.

12         Defendants assert that prior to June 22, 1993 the inventions claimed in both the '527 patent and

13   '440 patent were ready for patenting.  Defendants do not contend a reduction to practice, but instead argue

14   plaintiffs had "possession of schematics and other documents that disclosed every limitation of its alleged

15   invention, thus making it ready to patent before the critical date."  Mot. Summ. J. at 2.

16                **1.      Proving "Ready for Patenting"**

17         Before the court can determine whether the inventions were ready for patenting, two disputes

18   between the parties must be resolved.  First, plaintiffs argue that before defendants can prove that prior to

19   the critical date the inventors had prepared drawings or other descriptions of the invention that were

20   sufficiently specific to enable a person skilled in the art to practice the invention, defendants must define

21   "person skilled in the art," and provide evidence that in fact one skilled in the art would have been able to

22   practice the alleged invention.  Second, plaintiffs assert it improper to consider documents not prepared by

23   the inventors as part of the on-sale bar analysis.

24                **a.      Person of Ordinary Skill in the Art**

25         Plaintiffs contend that before it can be determined if one skilled in the art would have been able to

26   practice the invention based on the drawings and documents identified by defendants, the required level of

27   skill in the art must be established.  According to plaintiffs, defendants have failed to do this, thus, plaintiffs

28   assert defendants' motion for summary judgment should be denied.  Opp'n at 12.  Defendants, on the other

1   hand, argue that "person skilled in the art" is defined by the patents themselves since "the patents are at the

2   relatively high level of a functional description with no disclosure of circuit schematics, let alone layout,

3   tape-out, testing or debugging information," such that "the patents assume those tasks would be within the

4   ability of one of ordinary skill."  Reply at 10.

5       Defendants, however, fail to offer any expert testimony on the relevant level of skill in the art,

6   which plaintiffs argue is an essential element of the on-sale bar defense.  Instead, defendants offer the

7   deposition testimony from inventors Case and Verinsky.  While Case admits being in possession of an initial

8   set of schematics prior to the critical date, defendants have not proven that such schematics would have

9   enabled someone to make the invention.  Specifically, defendants present a number of documents that they

10  contend show every limitation of the '715 patent prior to the critical date, but present no expert testimony to

11  support the contention that a person skilled in the art would consider the pre-critical date documents "a full

12  set of circuit schematics," and from those documents be able to practice the invention of the '715 patent,

13  and therefore the '527 and '440 patents.  Rather, defendants instead rely primarily on deposition excerpts

14  from inventors Case and Verinsky.

15      Case and Verinsky testified, however, that the documents available before the critical date would

16  not have enabled them to practice the inventions of the '527 and '440 patents.  Verinsky states, for

17  example, that "[b]ecause we did not have adequate tools to simulate the IDE/ATA bus environment, the

18  fact that we had a schematic diagram for a particular function or feature of the OTI-011A does not mean

19  that the circuitry in the schematic diagram would operate in a manner that would permit the OTI-011A to

20  function properly in an IDE/ATA bus environment."  Verinsky Decl. ¶ 19.

21      Likewise, Case states that with the pre-critical date documents identified by MediaTek, including

22  the June 1993 Proposed ATAPI Specification "together with what was then general knowledge in the drive

23  storage field as of June 21, 1993, and without the benefit of any further development work and the

24  particular insights that I was then developing as an inventor, I would not have been able to practice the

25  claimed inventions of the '440 and '527 patent before the June 22, 1993 critical date."  Case Decl. ¶ 8.

26  Although defendants emphasize heavily that Case had a full set of initial schematics prior to June 1993, *see,*

27  *e.g.*, Mot. Summ. J. at 14-15; Reply at 2-3, this is not inconsistent with plaintiffs' assertions that the

28  schematics changed significantly after the critical date and before they were finalized.

1    Thus, to the extent that Case and Verinsky are purported to be persons skilled in the art, the

2    evidence is at best conflicting over what one of skill in the art would have known and whether pre-critical

3    date documents establish enablement.

4    **b.    Consideration of Documents Not Prepared by the Inventors**

5    Plaintiffs argue that the June 1993 Proposed ATAPI specification prepared by WD and the ATA

6    specification prepared by the American National Standards Institute ("ANSI"), which are both relevant to

7    communication over an IDE/ATA bus, may not be considered in the court's evaluation of whether the '527

8    and '440 were ready to patent before the critical date because they were not written by the inventors or

9    anyone at Oak.  Rather, they were received from third parties.  *See* Chen Decl. Exs. 9, 28.  Defendants

10   counter by arguing that numerous references to the ATA specification and June 1993 Proposed ATAPI

11   specification are made in both the '440 and '527 patents, thus indicating these documents were relied upon

12   when developing the OTI-011.  In addition, a hand-written reference by Verinsky appears to indicate that

13   both documents had been reviewed no later than June 13, 1993.  *See* Chen Ex. 10 at 1004DOC00194.[10]

14   To the extent the inventors referenced these documents prior to the critical date while developing

15   the OTI-011, the documents are relevant to determine whether one skilled in the art could have practiced

16   the invention.  These documents will be taken into consideration in the "ready for patenting" analysis.

17   **2.    Reduction to Practice**

18   Although a reduction to practice usually provides the best evidence that an invention is complete,

19   "one can prove that an invention is complete and ready for patenting before it has actually been reduced to

20   practice."  *Id.*  Thus, the second condition may be satisfied by showing either reduction to practice before

21   the critical date, or "by proof that prior to the critical date the inventor had prepared drawings or other

22   descriptions of the invention that were sufficiently specific to enable a person skilled in the art to practice the

23   invention."  *Id.* at 67; *Robotic Vision Sys. v. View Eng'g*, 249 F.3d 1307, 1311 (Fed. Cir. 2001);

24   *Scaltech, Inc. v. Retec/Tetra*, 269 F.3d 1321, 1328 (Fed. Cir. 2001); *Honeywell*, 370 F.3d at 1145.

25

26

27   [10]    Defendants' citation to Case's deposition testimony, however, only establishes that Case
referenced the ATA standard while doing his design work.  *See* Case 506 at 141:5-15.  Likewise,
28   Verinsky testifies only that he reviewed the June 1993 Proposed ATAPI Specification sometime in June
1993.  *See* Verinsky 506 at 496:16-497:4.

1    The parties do not dispute that the alleged inventions were not reduced to practice before the

2    critical date.  Nevertheless, defendants assert that plaintiffs' position requires the invention to have been

3    reduced to practice in order to have enabled all limitations in the patent claims.  Specifically, plaintiffs argue

4    that defendants must demonstrate that the documents available prior to the critical date describe an

5    "operable" invention since each independent claim of the two patents provides a limitation that claim

6    elements be "operable."[11]  Opp'n at 18.  Plaintiffs assert that since operable means "capable of being put

7    into practice," defendants are required to adduce evidence that the design elements were "capable of being

8    made operable," prior to the critical date.  *Id.*

9    Defendants contend that plaintiffs' argument that "operable" constitutes a limitation that must be

10   enabled essentially requires reduction to practice before "ready for patenting" is possible.  This, in essence,

11   would eliminate the possibility that "ready for patenting" could be demonstrated by one skilled in the art

12   being able to practice the invention based on otherwise enabling pre-critical date disclosures.  Requiring the

13   pre-critical date documents to describe "operable" limitations simply because plaintiffs used the word

14   "operable" in their claims appears to be an attempt to require defendants to prove reduction to practice in

15   order to satisfy the "ready for patenting" prong of *Pfaff*.

16                     **3.    Sufficiently Specific Enabling Drawings or Other Descriptions**

17   As set forth above, "ready for patenting" before the critical date may also be satisfied by showing

18   that the inventors disclosed the inventions in sufficient detail to enable one of skill in the art to practice the

19   invention.  *Pfaff*, 525 U.S. at 67.  In *Pfaff*, the patentee, Pfaff, held a patent on a computer chip socket.

20   Prior to the critical date, April 19, 1981, and in response to a request from representatives of Texas

21   Instrument ("TI"), "he prepared detailed engineering drawings that described the design, the dimensions,

22   and the materials to be used in making the socket, "then sent the drawings to a manufacturer in February or

23   March 1981.  *Id.* at 58.  On March 17, 1981 Pfaff showed the sketch to representatives of TI, and TI

24   placed a written purchase order for 30,100 new sockets on April, 8 1981, 11 days before the critical date.

25   *Id.*  As per his normal practice, Pfaff did not make and test a prototype of the new device before his offer

26   to sell, *see id.*, but at his deposition Pfaff testified that he was satisfied that the drawings were going to

27

28          [11]    For example, claim 1 of the '527 patent requires a "host interface *operable* to receive data
     addresses and commands from said host computer and transmit data to said host computer." '527 patent at
     28:45-50.

     ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OF INVALIDITY DUE TO THE ON-SALE BAR
     No. C-04-02619 RMW
     TNL/KMF/MAG                                                     13

1   work. *Id.* at 58 n.3.  The court concluded that the computer chip socket was reduced to practice in the

2   summer of 1981. *Id.* at 58.  Relying on Pfaff's drawings and deposition testimony, however, the court

3   found that the on-sale bar invalidated Pfaff's patent. *Id*. at 67-69.

4          In *Weatherchem Corp. v. J.L. Clark, Inc*., 163 F.3d 1326 (Fed. Cir. 1998), the invention

5   involved a two-flap, shake-and-spoon plastic cap for spices and other condiments.  While one flap covered

6   a plurality of small holes for shaking a spice or other product from the container, the other flap covered a

7   relatively large opening which allowed a spoon to enter and remove product from the container. *Id*. at

8   1328.  Prior art cap designs had a smaller spoon-side opening, because they tended to take an oval shape

9   when released from the cap mold.  The patentee Weatherchem devised a "wide internal sealing ledge" and

10  "land area between the spoon and shake apertures" which addressed this problem.  Affirming the district

11  court's application of the on-sale bar, the Federal Circuit noted, *inter alia*, that by February 1985, several

12  months before the October 17, 1985 critical date, that the inventor Hickman testified that he believed he

13  could make the design work, *id*. at 1334, and that a February 8, 1985 drawing included all the structural

14  limitations of the claims. *Id*. at 1333.  By August 1985, Weatherchem was making changes to the mold,

15  and expected to have the work completed by September 16, and in October the mold modifications were

16  characterized as "fine tuning" for "expected acceptable cap performance." *Id.* at 1334;  *see also Robotic*

17  *Vision Sys*, 249 F.3d at 1311 (inventor's oral description sufficient to allow computer programmer to write

18  software that successfully practiced invention).

19         In contrast, the inventor of an "attitude control system" for maintaining the position and orientation

20  of a satellite in orbit, called "prebias" technique, was found to have conceived of the idea well before it was

21  ready for patenting. *Space Systems/Loral, Inc. v. Lockheed Martin Corp*., 271 F.3d 1076 (Fed. Cir.

22  2001).  Specifically, after the inventor conceived of the idea, he testified that it was not until many months

23  later, after development and testing of an engineering model, that he determined the idea would work. *Id*.

24  at 1079.  Reversing the district court's application of the on-sale bar, the Federal Circuit noted that an

25  invention was ready for patenting only when it provided an enabling disclosure under 35 U.S.C. § 112.

26  *See id.* at 1080 (*citing Robotic Vision Sys.*, 249 F.3d at 1313)).

27                 For a complex concept such as the prebias technique, wherein the inventor
                   himself was uncertain whether it could be made to work, a bare conception that
28                 has not been enabled is not a completed invention ready for patenting.  Although
                   conception can occur before the inventor has verified that his idea will work, *see*

1    *Burroughs Wellcome Co. v. Barr Labs*., Inc., 40 F.3d 1223, 1228 [] (Fed. Cir.
1994), when development and verification are needed in order to prepare a
2    patent application that complies with § 112, the invention is not yet ready for
patenting.
3
*Id.*

4         In addition to disagreeing over how "ready for patenting" can be proven, the parties disagree as to

5    what constitutes "ready to patent," and the temporal requirements for determining enablement under the on-

6    sale bar versus 35 U.S.C. § 112.  The Federal Circuit has stated that for purposes of a patent application,

7    "[t]o be enabling, the specification of a patent must teach those skilled in the art how to make and use the full

8    scope of the claimed invention without 'undue experimentation.'"  *Genentech, Inc. v. Novo Nordisk A/S*,

9    108 F.3d 1361, 1365 (Fed. Cir. 1997).  Defendants assert this enablement standard, as required by 35

10   U.S.C. § 112,  is the same enablement necessary to show ready for patenting under *Pfaff*.  Supp. Brief

11   Support of Mot. Summ. J. at 13.  Plaintiffs do not disagree that the enablement standard is the same, rather

12   they assert that the enablement standard is applied at different times under § 112 and *Pfaff*,  because § 112

13   "requires an assessment of whether the patent specification would enable one skilled in the art to practice the

14   invention at the time when the patent application is filed."  Pl. Resp. Supp. Br. at 8.  Essentially plaintiffs

15   argue that because enablement for purposes of the "ready for patenting" analysis is determined one year

16   prior to the filing date, relies on different documents, and takes into consideration what is known of one

17   skilled in the art at a point in time at least one year before filing, the enablement query is not identical because

18   it is shifted in time by one year and the level of one of skill in the art may have changed over time.

19        The Federal Circuit has stated "[t]o be 'ready for patenting' the inventor must be able to prepare a

20   patent application, that is, to provide an enabling disclosure as required by 35 U.S.C. § 112."  *Space

21   Systems*, 271 F.3d at 1080; *see also Robotic Vision Systems*, 249 F.3d at 1313.  Thus, the Federal

22   Circuit recognized that even though "ready for patenting" for purposes of the on-sale bar may occur one year

23   prior to filing a patent application, the enablement standard used to determine if the invention is ready to

24   patent is the same standard that is used when determining if the patent meets the requirements of section

25   112.  The ready for patenting standard under *Pfaff* does, however, imply a requirement that one skilled in

26   the art could practice the invention prior to the critical date.  Therefore, if at the critical date one skilled in the

27   art is unable to practice the invention, but before the patent application is filed, the level of knowledge of one

28   skilled in the art increases allowing them to practice the invention, the invention can be enabled at the time of

1   filing even if it was not ready for patenting at the critical date.  Under this second prong of *Pfaff*, an invention

2   does not become ready for patenting because "the inventors disclosed the inventions in sufficient detail to

3   enable one of skill in the art to practice the invention" until the level of skill is sufficient enough to allow one to

4   practice the invention.  The court therefore agrees that the enablement under *Pfaff*'s "ready for patenting"

5   prong is the same standard as enablement under section 112 but the level of skill may be different at the filing

6   date and critical date.[12]

7         Plaintiff contends that, with respect to the disputed invention, what one skilled in the art could

8   accomplish between the critical date and the filing date significantly increased.  Because of the increased

9   knowledge, plaintiff argues, the invention was not ready for patenting prior to the critical date.  It was not

10  until the level of skill increased at some point during the year between the critical date and filing date that the

11  invention would have been ready for patenting.  While the court makes no findings with regard to the merits

12  of this argument, the court recognizes that plaintiff has raised a triable issue of fact as to whether the level of

13  skill in the art significantly increased during that one year period such to allow the invention to meet the

14  enablement standard at the time the application was filed.

15        In addition, defendants' argument that the invention was ready for patenting suffers from the flaw,

16  discussed above, in that it relies upon the proposition that the inventors' possession of the ATAPI document

17  enabled the inventors to practice the invention.  Defs.' Supp. Br. Supp. Mot. Summ. J. at 14 ("[E]ven if

18  ATAPI was not available to aid the public's understanding (and thus enablement) of Oak's invention until

19  June 1994, it was indisputably available to enable the ***Oak inventors*** to practice the invention in June

20  1993.") (emphasis in original).  As previously set forth, the inventors have testified that the invention was not

21  enabled until after the tape-out and that the June 1993 ATAPI Proposed Specification did not enable them

22  to practice the invention.  Defendants' argument depends upon proving that the documents available to the

23  inventors before the critical date enabled the inventors to practice the invention.  Defendants have not yet

24  demonstrated this by clear and convincing evidence.

25

26

_____

27        [12]   35 U.S.C. § 112, in relevant part, states "[t]he specification shall contain a written
      description of the invention, and of the manner and process of making and using it, in such full, clear,

28    concise, and exact terms as to enable any person skilled in the art to which it pertains...to make and use the
      same, and shall set forth the best mode contemplated by the inventor of carrying out his invention."

### a.    Level of Patent Disclosure

Defendants assert the alleged invention is "merely a high level functional 'architecture' of an IDE/ATA Host Interface." Mot. Summ. J. at 11.  Further, defendants claim there is nothing in the patents regarding layout of any circuitry.  *Id.* at 12.  Essentially, the patents at issue contain no schematics and are simply architectural, thus defendants contend that since plaintiffs were in possession of initial schematics before the critical date, they were in possession of more then what is required for the invention to be "ready for patenting."  Essentially, defendants argue that if plaintiffs were in possession of initial schematics before the critical date they were in possession of documents or other descriptions that would have allowed one skilled in the art to practice the invention.

Plaintiffs, on the other hand, contend that the issue is not whether the patent specification discloses circuit schematics, but whether the pre-critical date schematics could have, in combination with pre-critical date documents, taught someone skilled in the art to practice the invention without undue experimentation. Pl. Resp. Supp. Br. at 12.  Further, plaintiffs argue that the initial schematics described an inoperable device. *Id*.  Regardless of being in possession of initial schematics, plaintiffs essentially argue, as set forth above, that one skilled in the art would not have been able to practice the invention based on the pre-critical date documents, since the inventors themselves were unable to.  However, in determining whether an invention is ready for patenting, the Federal Circuit stated "[notably absent from this test is a requirement that an inventor have complete confidence that his invention work will work for its intended purpose." *Robotic Vision Sys*., 249 F.3d 1307.

In a further attempt to prove that the pre-critical documents would not have enabled one skilled in the art to practice the invention, plaintiffs point to the tape-outs and subsequent changes that took place after the critical date.  Plaintiffs argue that because these changes were necessary to create the invention, the initial schematics and pre-critical documents could not have, as defendants assert, allowed one to practice the invention.

### b.    Relevance of Tape-Out and Subsequent Changes

Although conception can occur before an inventor has verified the idea will work, when development and verification are needed in order to prepare a patent application that complies with § 112, the invention is not yet ready for patenting until such verification has taken place. *See Space Systems*, 271

1   F.3d at 1080.  The question then turns on whether verification was necessary to prepare the patent

2   application such that it complied with § 112.  Plaintiffs assert that because of the relative newness of the

3   technology coupled with the inventors' own testimony that they were not sure the invention would work,

4   verification was necessary.  Under plaintiffs' arguments, verification did not occur until after the critical date

5   when both a successful tape-out had been completed and at least 30 changes had been made to the

6   inventions.  Defendants on the other hand, assert that verification was not necessary and that one skilled in

7   the art could have used the documents available prior to the critical date to practice the invention.

8   Defendants are correct that if the pre-critical date documents could have enabled one skilled in the art to

9   practice the invention, verification would not be relevant to the "ready for patenting" analysis.  However,

10  since plaintiffs allege that defendants could not meet their burden of proving that the pre-critical documents

11  were sufficient to allow one to practice the invention, this court finds, in this circumstance, it necessary to

12  determine if the tape-out and post critical date changes were in fact needed to allow one to practice the

13  invention.

14          Defendants argue that, as the '527 and '440 patents have "nothing to do with the layout of any

15  circuitry . . . a tape-out is utterly irrelevant to 'readiness to patent.'"  In support, defendants rely on Case's

16  deposition testimony that the figures in the '527 patent include block diagrams and register definitions that

17  describe the functionality of circuitry at a higher level, and that there are several possible circuits that could

18  be used to accomplish the same function shown in those block diagrams.  *See* Case 506 at 497:498:7.  As

19  the tape-out includes detailed layout information, i.e., instructions for the physical placement of various

20  components on a silicon chip, defendants submit that the timing of the tape-out is irrelevant to when the '527

21  and '440 applications were ready for patenting.  Defendants also note that the engineer responsible for the

22  layout of the OTI-011, Yalan Hsu, was not a named inventor on the '527 and '440 because she was not

23  involved in the architecture of the chips.  *See* Verinsky 506 at 477:3-478:8.

24          Defendants' argument is contradicted by Verinsky's statements that there were no simulation tools or

25  programs that would permit confirmation, without first performing a tape-out and then reducing a design to

26  an actual silicon chip, that the OTI-011 designs would work in a real world IDE/ATA bus environment.

27  Verinsky Decl. ¶¶ 18-19.  Likewise, Case states that "we were under a lot of pressure to get the OTI-011A

28  taped-out and into silicon, and that we taped-out and went to silicon as soon as we could.  Had we

1    possessed a complete design at an earlier date that we believed would be operable, we would have

2    progressed to the tape-out, silicon, debug and testing phases much sooner than we actually did." Case Decl.

3    ¶ 7.  Plaintiffs contend they conducted the first tape-out on July 22, 1993, but due to a problem in the

4    design, the tape-out had to be aborted, and that it was not until the problem was corrected that the July 29,

5    1993 tape-out was successful.  Opp'n at 6.  The court is satisfied that plaintiffs' assertion that the July 22,

6    1993 and July 29, 1993 tape-outs were necessary at an earlier juncture in the development process due to

7    the lack of simulation software available is plausible and raises an issue of fact as to whether the '715 patent

8    was ready for patenting prior to the critical date.

9           Plaintiffs further assert that the invention was not "ready for patenting" on June 22, 1993 because

10   "the inventors continued to make significant changes to their designs (at least 30) after the critical date and

11   before tape-out, many of which directly relate to the claim limitations of the patents, and at least one of

12   which was required for all the claims of both patents to be enabled." Opp'n at 17.  The issue, however, is

13   not whether the changes made the invention operable, but whether the changes would have been necessary

14   to allow one skilled in the art to practice the invention.  To that end, defendants classify the changes made

15   after the critical date as merely "fine tuning" and not essential to the patent application.  Defendants in

16   essence argue that since the changes are not reflected in the patent application, they are not necessary for the

17   "ready for patenting" standard.[13]  Changes to a product that do not address the matter claimed, do not

18   preclude the application of the on-sale bar rule.  *Honeywell,* 343 F. Supp. 2d at 293; citing *New Railhead*

19   *Mfg., LLC v. Vermeer Mfg., Co.*, 298 F.3d 1290, 1927-98 (Fed. Cir. 2002).  Thus, defendants need only

20   prove the changes were not necessary to allow one skilled in the art to practice the invention without undue

21   experimentation.

22          In *Robotic Space Sys.* the court found the invention "ready for patenting" before the critical date

23   because the inventor explained the invention to Daniel Briceno, asking him to write the software for full-tray

24   scanning.  *Robotic Space Sys.,* 249 F.3d at 1311.  "This explanation was sufficiently specific for Briceno to

25   understand the invention and to write the software needed to implement the method." *Id*.  So long as the

---

[13]    This argument relies on the assumption that enablement for purposes of the on-sale bar is
the same as enablement under section 112.  As noted above, the court agrees that the enablement
standards are the same.  Thus, defendants essentially argue that if the patents are valid under section 112,
and the specifications contained in 112 do not reflect any changes made after the critical date, plaintiffs'
invention was ready for patenting regardless of the changes.

1    enabling explanation occurs before the critical date, the invention is ready for patenting, even if it is not

2    reduced to practice until after the critical date. *Id*.

3            There still remains a genuine question of fact regarding defendants' ultimate contention that the initial

4    schematics coupled with other pre-critical date documents were sufficient to allow one skilled in the art to

5    practice the invention.  For example, if, as defendants assert, those documents were sufficient, then the

6    person responsible for the tape-out should have been able, like Briceno in *Robotic Space Sys.,* to

7    understand the invention enough to successfully reduce it to practice.  However, as demonstrated by

8    plaintiffs, this was not the case, since the first tape-out failed.  While plaintiffs have failed to demonstrate that

9    the post-critical date changes were necessary in any specific way, viewing all evidence in favor of plaintiffs, it

10   can be inferred from the failure of the first tape-out that the initial schematics would not have allowed one

11   skilled in the art to practice the invention.

12           This inference is particularly pertinent in this situation since defendants have offered no evidence of

13   the level of skill in the art at either (1) the time they claim the invention was ready for patenting; or (2) the

14   time the patent application was filed.  Without such evidence, defendants are unable to meet their burden of

15   proving by clear and convincing undisputed evidence that the invention was ready for patenting prior to the

16   critical date.

17                      **C.    Claim-Specific Contentions**

18           The court denies defendants' motion in part because of their failure to provide by clear and

19   convincing evidence that one skilled in the art would have viewed the pre-critical date documents as

20   enabling, and in part because plaintiffs have raised a genuine issue regarding whether verification was

21   necessary to create an enabling invention that met the "ready for patenting standard."  Therefore, a claim-by-

22   claim analysis is not necessary at this time.

23                              **III.  ORDER**

24           For the foregoing reasons, defendants' motion for summary judgment of invalidity based on the

25   on-sale bar is DENIED.

26   DATED:      10/17/05                          /s/ Ronald M. Whyte
                                                   RONALD M. WHYTE
27                                                 United States District Judge

28

1  **Notice of this document has been electronically sent to:**

2  **Counsel for Defendants:**
   James C. Otteson          jotteson@wsgr.com
3  Lisa G. McFall            lmcfall@wsgr.com
   Michael A. Ladra          mladra@wsgr.com
4
   **Counsel for Plaintiffs:**
5  Gerald T. Sekimura        gerald.sekimura@dlapiper.com
   John Allcock              john.allcock@dlapiper.com
6  Mark Fowler               mark.fowler@dlapiper.com
   Thomas A. Burg            thomas.burg@dlapiper.com
7  William G. Goldman        bill.goldman@dlapiper.com
   Aaron Wainscoat           aaron.wainscoat@dlapiper.com
8  Michael Schwartz          michael.schwartz@dlapiper.com

9

10  **Dated:**        10/17/05                    /s/ MAG
                                          **Chambers of Judge Whyte**
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28